WEISBERG LAW  
Matthew B. Weisberg, Attorney ID No. 85570  
7 South Morton Ave.  
Morton, PA 19070  
610-690-0801  
Fax: 610-690-0880  
**Attorney for Plaintiff**

Schafkopf Law, LLC  
Gary Schafkopf, Attorney ID No. 83362  
11 Bala Ave  
Bala Cynwyd, PA 19004  
610-664-5200 Ext 104  
Fax: 888-283-1334  
**Attorney for Plaintiff**

# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CYNTHIA PUGH**<br>222 Ridge Avenue<br>Middletown, PA 17057<br><br>        Plaintiff,<br><br>v.<br><br>**COMMONWEALTH OF PENNSYLVANIA**<br>225 Main Capital Building<br>Harrisburg, PA 17120<br>   and<br><br>**PENNSYLVANIA OFFICE OF THE ATTORNEY GENERAL**<br>Torts Litigation Unit<br>15th Floor, Strawberry Square<br>Harrisburg, PA 17120<br>   and<br><br>**JONATHAN DUECKER**<br>Office of the Attorney General<br>16th Floor, Strawberry Square<br>Harrisburg, PA 17120<br><br>        Defendants. | NO:<br><br><br><br><br><br><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## CIVIL ACTION COMPLAINT

## JURISDICTION AND VENUE

1. Jurisdiction in this Honorable Court is based on a violation of federal law conferred by 28

U.S.C. § 1331. This Court has supplemental jurisdiction of Plaintiff's claims under the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq*. ("PHRA") pursuant to 28 U.S.C. § 1367.

2. Venue is appropriate in this judicial district because at all times material to this complaint Plaintiff resided and worked for the OAG in this judicial district, and the material acts and omissions giving rise to this action occurred in this judicial district.

## PARTIES

3. The averments of the foregoing paragraphs are hereby incorporated by reference as if set forth fully herein.

4. Plaintiff, Cynthia Pugh, is an adult individual citizen of the United States, currently residing at the above-captioned address.

5. Plaintiff is a Narcotics Agent with the Pennsylvania Office of the Attorney General.

6. Plaintiff at all relevant times was an "Employee" within the meaning of the PHRA and of Title VII of the Civil Rights Act.

7. Defendant Commonwealth of Pennsylvania (hereinafter "Defendant Commonwealth") is an independent State within the United States with the enabling power to establish entities and departments which serve to operate and manage local and statewide governmental concerns. Defendant Commonwealth establishes, enables, and operates departments and public entities within which Plaintiff was employed, including but not limited to the Office of the Attorney General. Defendant Commonwealth has its principal offices located at the above captioned address. Defendant Commonwealth is an "Employer" for purposes of the PHRA and of Title VII of the Civil Rights Act.

8. Defendant Pennsylvania Office of the Attorney General ("Defendant OAG") is the law

enforcement branch of the Commonwealth of Pennsylvania, located at the above-captioned address. Defendant OAG is an "Employer" for purposes of the PHRA and of Title VII of the Civil Rights Act.

9. Defendant Commonwealth and Defendant OAG were at all relevant times joint employers of Plaintiff.

10. Defendant Jonathan Duecker (hereinafter "Defendant Duecker") was at all times relevant herein an OAG employee. He was promoted to the position of Chief of Staff in April 2014. Prior to his promotion he served in the position of Special Agent in Charge of the Bureau of Narcotics Investigations and Drug Control. He is sued individually and in his official capacity.

11. At all times relevant to this action, Defendant Commonwealth and Defendant OAG acted by and through their agents, servants, and employees, including Defendant Duecker, who acted within the scope of their authority and within the course of their employment.

**OPERATIVE FACTS**

12. The averments of the foregoing paragraphs are hereby incorporated by reference as if set forth fully herein.

13. Plaintiff is a member of protected classes, in that Plaintiff is a forty-five year old African American woman. Plaintiff is also in protected classes of persons because she made a charge of discrimination with the Equal Opportunity Commission and with the Pennsylvania Human Relations Commission, as described more fully below.

14. Plaintiff was hired by Defendant OAG in or about April of 2000. Plaintiff currently works for Defendant OAG in Lemoyne, Pennsylvania.

15. Defendant Duecker was Plaintiff's supervisor and then Special Agent in Charge of the

Bureau of Narcotics Investigation and Drug Control for the OAG.

16. Beginning in December 2013, Plaintiff was sexually harassed, racially discriminated against, and demoted following an office Christmas Party.

17. In December of 2013, Plaintiff's unit had a Christmas party at a house provided for narcotics agents in the Mobile Street Crimes Unit, where Plaintiff generally stayed while she was working.

18. Defendant Duecker made unwelcome verbal and physical sexual advances toward Plaintiff after the party.

19. Following the party Plaintiff and Defendant Duecker were alone in the house, as the others had left because of bad weather, and Plaintiff had decided to stay there that night because she had been staying there every night that week. The last two other agents to leave were Mr. Giammarco and Mr. Freer, who observed that Defendant Duecker was visibly drunk by the time they left.

20. When everybody else had left, Defendant Duecker asked Plaintiff "Where do you see yourself in the agency in the next three to five years?" in such a way that implied to Plaintiff that Defendant Duecker was offering to advance her career in exchange for sexual favors.

21. After getting up to use the bathroom, Defendant Duecker approached Plaintiff from behind while she sat on a couch and took her hair and flipped it out of her face, while Plaintiff scooted away from him. He then sat next to Plaintiff and put one hand on Plaintiff's leg and the other up her jacket.

22. Plaintiff made it clear to Defendant Duecker that these advances were unwelcome and went to bed, asking Duecker to lock the door behind him after he left, or if he planned to stay, to sleep in one of the rooms in the men's wing of the house.

23. After Plaintiff went to her bedroom, Defendant Ducker entered her bedroom uninvited and stood over her while she was in bed. Plaintiff asked "Can I help you," to which Defendant Duecker replied "Maybe I can help you." Plaintiff said "no." Defendant Duecker shook his head and said "Ok, I'm going to go then." Plaintiff said "Ok, lock the door behind you." Defendant Duecker continued to stand there looking at Plaintiff for about twenty seconds before leaving. After he left, Plaintiff was terrified and got up and locked all of the doors before going back to her room.

24. In January of 2015, Plaintiff was transferred from the Mobile Street Crimes Unit to her former Narcotics Unit in which she had significantly less earning potential.

25. Upon information and belief, this transfer was facilitated by Defendant Duecker, who gave no justification for this transfer either to Plaintiff, to Plaintiff's former supervisor, to the Regional Director, or to the OAG's Human Resources department ("Human Resources").

26. Upon information and belief, Defendant Duecker had Plaintiff demoted and transferred to a lesser paying unit in retaliation for Plaintiff having spoken up against him sexually assaulting her, in hopes that he could sweep the entire situation under the rug.

27. Plaintiff did not immediately report Defendant Duecker's conduct for a number of reasons, including that she liked her direct superiors and her unit, and out of fear of retaliation.

28. Upon information and belief, in February of 2014 Defendant Duecker engaged in similar sexual harassment toward another OAG employee, Ms. Michelle Kluk, an attorney for the unit, as follows: Defendant Duecker approached Ms. Kluk during a gathering at a Damon's Bar and Grill in Hazleton, and took her hair and flipped it out of the way. Ms. Kluk slapped his hand away and moved locations to sit with another agent. Mr. Ducker followed her there, and proceeded to try to force his hand up her shirt. Ms. Kluk "became hysterical at that point,

and stormed out." Defendant Duecker left the bar shortly thereafter.

29. In March of 2015, Plaintiff provided a recorded statement describing the December 2013 sexual assault to Mr. Chad Ellis, the Deputy Chief of OAG's Office of Professional Responsibility ("OPR").

30. During this meeting, Plaintiff was informed by Mr. Ellis that Defendant Duecker had brought allegations against agents Mr. Giammarco and Mr. Freer. Upon information and belief, these allegations were false. Plaintiff told Mr. Ellis that she believed these allegations to be false.

31. Around the time of this meeting, all the other agents in Plaintiff's unit, which included Mr. Giammarco and Mr. Freer, were being called in by OPR for questioning. Upon information and belief, two of Plaintiff's colleagues told OPR about the incident at the Christmas party between Plaintiff and Defendant Duecker.

32. On or around the beginning of April 2014, following the OPR investigation into Defendant Duecker's sexual harassment of subordinate employees, Mr. Ellis reported the findings to Defendant Kane. OPR's investigation found that in addition to sexual harassment, Defendant Duecker had violated policy, taken retaliatory actions against agents, and bullied employees into breaking policy.

33. Upon information and belief, in mid-April, approximately a week after Mr. Ellis provided these reports to Defendant Kane, Mr. Ellis called Mr. Moore and told him that Defendant Duecker had asked him whether the sexual harassment suit could "die on the vine."

34. On April 22, 2015, Mr. Moore submitted a recommendation to Bruce Beemer, the First Deputy Attorney General, calling for Defendant Duecker's termination for violating the OAG's Sexual Harassment Policy and in violation of state and federal laws. This recommendation was based on "a pattern of sexual misconduct, targeting a subordinate, and

showing an abuse of power."

35. On April 22, 2015, Defendant Kane promoted Defendant Duecker to the position of Chief of Staff of the OAG.

36. On April 24, 2015, Plaintiff went back over her previous statement with OPR and Human Resources with Bill Nichols, an OPR inspector, and George Moore, the head of EEO in Human Resources. At this meeting, Plaintiff gave a more detailed recorded statement. Plaintiff also told Mr. Moore that she wanted Defendant Kane to take the appropriate action in the situation, which was for Defendant Duecker to be terminated. During this interview, Mr. Nichols was receiving text messages, and relayed to Plaintiff that nothing would happen to her. Plaintiff believed these messages were coming from Mr. Ellis, because during Plaintiff's initial meeting with Mr. Ellis in March 2015 she had greatly stressed her concerns about retaliation once this information got out.

37. Despite Plaintiff's requests, neither OPR nor Human Resources has ever provided Plaintiff with a copy of her recorded statements, despite the fact that Plaintiff had to go in and sign off on them.

38. On April 27, 2015, Plaintiff learned that Defendant Kane had promoted Defendant Duecker to the Chief of Staff position.

39. Upon information and belief, at the time of Defendant Duecker's promotion, Defendant Kane was aware of allegations of sexual misconduct by Defendant Duecker.

40. Upon information and belief, at the time of Defendant Duecker's promotion, Human Resources had recommended to Defendant Kane that Defendant Duecker be fired.

41. On April 30, 2015, Plaintiff was notified by Mr. Moran, an attorney of the Fraternal Order of Police ("FOP"), which represented OAG agents including Plaintiff, that Mr. Moran had met

with Defendant Kane to discuss Plaintiff's complaint, wherein Defendant Kane asked Mr. Moran what she could do to make it better, and stated to Mr. Moran that she did not think Plaintiff wanted Defendant Duecker to be fired. When Plaintiff heard about this exchange, Plantiff informed Mr. Moran that Defendant Kane's statement was false, and that Plaintiff wanted Defendant Kane to follow Human Resources' recommendation that Defendant Duecker be terminated.

42. On May 2, 2015, an article was released by a member of the press in which Defendant Kane defended Defendant Duecker, and falsely claimed not to have been aware of an investigation against Defendant Duecker when she promoted him.

43. On May 9, 2015, FOP sent a letter to Defendant Kane requesting that Defendant Duecker be fired in accordance with the recommendation of Human Resources.

44. On May 12, 2015, upon information and belief, Defendant Kane met with Mr. Moran, offering them better contract terms in exchange for them cooperating with Defendant Kane and suppressing Plaintiff's allegations against Defendant Duecker. Defendant Kane also requested that Plaintiff make a public statement denying that Defendant Duecker had assaulted her, and say that she did not want him to be fired. Plaintiff refused to make a public statement to this effect.

45. On May 20, 2015, Plaintiff informed Mr. Moore and Ms. Anita Robinson in Human Resources about what she had learned about the May 12 meeting between Defendant Kane and FOP legal representatives.

46. On June 5, 2015, Plaintiff applied for a supervisory position in Region III. On June 17, 2015, Plaintiff was informed by Human Resources that her resume had been received and that it was being forwarded to Executive Deputy Attorney General, Larry Cherba. Plaintiff was

interviewed for this supervisory position on July 17, 2015. Defendant Kane and Defendant Duecker, as Chief of Staff, had the final say in the hiring decision for this position.

47. On June 24, 2015, Mr. Moore, who had investigated Plaintiff's complaint and recommended that Defendant Duecker be terminated, was fired.

48. On August 18, 2015, Plaintiff filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission, Philadelphia District Office (the "EEOC") against Defendant, Commonwealth, which set forth in detail the nature of the sexual harassment, racial discrimination, and retaliation she had experienced at the hands of Defendant Duecker. This charge was dual-filed with the Pennsylvania Human Relations Commission under the PHRA. The original charge will be attached as follows (*See* Exhibit "__", 8/18/15 Charge of Discrimination).

49. On August 21, 2015, Plaintiff received an email informing her that she had not received the promotion, and that the position was instead given to a man nearly ten years younger than her, who was significantly less qualified for the position.

50. As a result of being sexually harassed, racially discriminated against, demoted, denied a promotion, and treated with hostility by her supervisors at the OAG, Plaintiff has sought psychiatric treatment between May 20, 2015 and the present. Plaintiff has been going to therapy one to two times per week and is now taking anti-anxiety medications which she did not take prior to the December 2013 assault.

51. As a result of Defendant Duecker's December 2013 sexual assault on her, Plaintiff "remain[s] traumatized about this incident to the present, and [has] found it incredibly difficult to interact with Mr. Duecker since that time."

52. As a result of Plaintiff's January 2015 transfer to her old unit, Plaintiff was unable to work as

much overtime, and because of this Plaintiff has lost approximately $20,000 per year in earning power since the transfer.

## COUNT I
## 42 U.S.C. § 2000e *et seq.* –  TITLE VII OF THE 1964 CIVIL RIGHTS ACT

53. Plaintiff incorporates by reference all prior paragraphs as if fully set forth at length herein.

54. Defendants retaliated against Plaintiff for reporting the aforesaid discrimination and harassment in the workplace, by taking the adverse employment actions of transferring her to a less favorable assignment and not hiring her to a supervisory position for which she was well qualified.

55. Plaintiff suffered harm due to Defendants' conduct.

## COUNT II
## 29 U.S.C. § 621 *et seq.* – AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967

56. Plaintiff incorporates by reference all prior paragraphs as if fully set forth at length herein.

57. Plaintiff was a member of a class protected by the ADEA because she was forty-three years of age at the time of the adverse employment action.

58. Despite being well-qualified for the promotion to a supervisory position, Plaintiff was not promoted to this position.

59. Defendants instead chose a less-qualified male employee nearly ten years younger than Plaintiff for the position.

60. Plaintiff suffered harm due to Defendants' conduct.

## COUNT III
## 43 P.S. § 951, *et seq.* – PENNSYLVANIA HUMAN RELATIONS ACT

61. Plaintiff incorporates by reference all prior paragraphs as if fully set forth at length herein.

62. Defendants' discriminatory actions aforesaid also violate the PHRA.

63. Plaintiff suffered harm due to Defendants' conduct.

**WHEREFORE**, Plaintiff respectfully requests this Honorable Court enter judgment in her favor and against Defendants, individually, jointly and/or severally, in an amount in excess of seventy-five thousand dollars ($75,000), plus such other and further relief as this Honorable Court deems necessary and just, and to Order the following relief:

Respectfully Submitted,

| | |
|---|---|
| WEISBERG LAW | SCHAFKOPF LAW, LLC |
| BY: */s/ Matthew Weisberg* <br> MATTHEW B. WEISBERG, ESQ | BY: */s/ Gary Schafkopf* <br> GARY SCHAFKOPF, ESQ. |
| DATED: 1/16/2018 | DATED: 1/16/2018 |